## No. 3516

### Second Circuit

### (Second Division)

## KEELEY v. CLARK & MORSE LBR. CO., INC.

(June 11, 1931. Opinion and Decree.)

Harry V. Booth, of Shreveport, attorney for plaintiff, appellant.

Pujo, Bell & Hardin, of Lake Charles, attorneys for defendant, appellee.

TALIAFERRO, J. Plaintiff, the widow of Frank Keeley, deceased, instituted this suit against Clark & Morse Lumber Company, Inc., to recover compensation to the amount of $5,980 and $150 for funeral expenses, on account of the death of her said husband, an employee of defendant, while on an errand alleged to have been incidental to his employment and within the scope thereof. She alleges that he was receiving approximately $32.50 per week wages when he lost his life on February 27, 1927, as the result of the automobile in which he was riding turning over on the highway. His position was that of circular saw filer, but in absence of the mill foreman and other executive officers kept time and performed other duties. Defendant admits that deceased was in its employ when killed and was receiving the wages alleged by plaintiff, but specially denies that at time of his death he was performing any service arising out of and incidental to his employment.

Plaintiff's demand was rejected by the lower court, and she prosecutes this appeal.

Issues of fact only are involved.

The petition does not disclose the character of defendant's business deceased was engaged in when killed. Plaintiff's theory is that he had started to Montrose, some three or four miles north of Derry, to get some machinery needed for repairing defendant's mill.

Plaintiff, as a witness in her own behalf, says: That her hsuband worked at defendant's mill until 11 o'clock Sunday morning, February 27, 1927, and then came home for dinner, changed his clothes, borrowed a car from defendant, and, accompanied by her and their small son, the trip up the river was begun. That when about one mile from Derry he took out his watch and remarked: "We won't have time to go up there and get back by one in time to put the men to work. I will go back and tell Eddie what to do and then go on." That he then turned the car about and headed for Derry and as they drove upon the bridge over Cane river another car drove on the opposite end, and, while backing his car off of the bridge and onto the embankment (approaches), it turned over, causing injury to him of which he died immediately.

Plaintiff testified that she told several persons after the accident to and death of her husband that he had started to Montrose for some machinery for the sawmill, but no witness was introduced to corroborate her on this point.

E. W. McCall, adjuster of the company with whom defendant carried insurance, in August or September, interviewed plaintiff to secure from her the facts of her husband's death. Her statement was reduced to writing. She admits signing it and that it was read to her before she did sign it. She does not challenge its correctness. As some of the contents of this statement have an important bearing upon plaintiff's evidence, we quote it in full:

"On Feb. 27th my husband, Frank C. Keeley, took myself and our boy in the Willys-Knight roadster belonging to Clarke & Morse Lumber Co., and went to the forks of the Natchitoches highway about 2 miles from the mill. We left the mill at 12:20 P. M. Mr. Keeley had been out about the mill that morning. I don't know whether he was working or not but he had his work clothes on, and I suppose he had been working. He came to the house about 11:00 or 11:30. We had dinner and then Mr. Keeley told me that he had to go to Montrose and asked me to go with him. He did not say what he was going for and I do not know what he was going for. We got our boy and left at once. When

we got to the forks of the road or just before we got there, Mr. Keeley looked at his watch and said, 'By golly, we are not going to have time to make it now. We will go back and we will go later.' I suppose that he meant he had to go back and put the men to work at the mill and go to Montrose later. He turned the car around at the forks of the road and started back to the mill. When we got to the Cane river bridge, we had started on the bridge, we were about 20 or 30 feet from the end of the bridge, when a car drove on the other end of the bridge. When the other car got on the bridge Mr. Keeley backed off of the bridge and when he did so he backed over the side of the dump and the car turned over.

"I went on this trip just to be with Mr. Keeley. I do not know what he went for. We did not go over there to get any kind of vegetables or poke salad."

Mrs. Keeley gave the following testimony on direct examination:

"Q. Where did he go after he left the mill?
"A. He came home for lunch and after lunch we started to Montrose after machinery.
"Q. Do you mean your husband and you left for Montrose after machinery?
"A. Yes, sir.
"Q. What was the machinery for?
"A. For repairs to be used for repairs at the mill.
"Q. Did you arrive at Montrose?
"A. We did not.
"Q. For what reason?
"A. After going about a mile, approximately a mile up the road, my husband looked at his watch and said 'We won't have time to go and get back in time to put the men to work at one o'clock,' so we started back.
"Q. Back to where?
"A. To the saw mill so he could put the men to work."

It will be observed that there is material difference in detail and substance between the three versions given by Mrs. Keeley of the reasons assigned by her hus-

band for not going on to Montrose after looking at his watch. In the statement to Mr. McCall, given many months after the death of her husband, she declared twice she did not know why he was going to Montrose. In her petition no detail information on this point is given, while in her evidence at trial of case she stated he was going to Montrose for repairs for the mill. In her evidence, quoted in the beginning of this opinion, she said her husband declared he would go back and "tell Eddie (referring to Eddie Carter) what to do and then go on," while in the statement to McCall no reference to Carter is made, but she did say, "I suppose that he meant that he had to go back and put the men to work at the mill and go to Montrose later."

It is disclosed by the evidence that there was no one at the mill after 11 o'clock that Sunday morning excepting Louis Rachal, the fireman whose duty it was to "keep up insurance steam." There was no one there to put to work, as Carter testified he quit work when Mr. Keeley left the mill.

Eddie Carter, an employee of defendant when Keeley was killed, stated, as a witness, that he was at the sawmill the morning before the accident and put a pin in the ratchet wheel; that Keeley was there also and did some work on the roller bed and left the mill about 11 o'clock, and that he (witness) quit work at same time; that he, Keeley, and Louis Rachal, the fireman, only were at the mill that morning; that deceased told him as he left the mill that he was going to Montrose to get the gear to repair the machinery; that he and deceased hunted together on Friday previous; that he never told any one, except his wife and father, that Mr. Keeley was going to Montrose for the gear to repair the

mill, and that neither Mrs. Keeley nor her attorney knew what his testimony would be before he gave it on trial.

Louis Rachal, the fireman, witness for plaintiff, stated that he was at the mill the day Keeley was killed "holding insurance steam," but did not see either Keeley or Eddie Carter. However, he did see Keeley there the day he cleaned out the boilers, which was on Saturday; that Keeley told him on that day he was going to Montrose Sunday to get a piece of machinery; that the mill did not run on Friday, February 25th. On March 20, 1927, this witness signed a written statement, before two attesting witnesses, wherein he stated he washed out the boilers of the mill on February 27th. In his testimony at trial of case he explained that he had erred in fixing this date as the 27th.

Defendant contends that plaintiff's husband never intended to go to Montrose the morning he was killed for any machinery for its mill, but, on the contrary, the trip was made to secure some poke salad (greens) which grew wild along the banks of Cane river and over the adjoining country.

Mr. J. T. George, assistant bookkeeper for defendant, testified that when deceased asked for the loan of the company's car he stated that he desired to go up the river for some poke salad, and would be gone not more than twenty or thirty minutes. Joe Haley, another witness, stated that, as Keeley and wife were leaving the company's commissary on this trip, Mrs. Keeley, in the presence of her husband, invited him to go along with them, saying that they were going for poke salad. Eight other witnesses testified that very soon after the tragedy, while Mrs. Keeley was in great distress and anguish, she told them that she and Mr. Keeley had

gone up the river to get some poke salad. To some of these witnesses she reproached herself for having insisted on making the trip, her husband not caring to do so as the brakes of the car were not good.

O. Spillman was the day watchman at the mill on February 27th. He did not see either Keeley or Carter there that morning, but did see Keeley at the commissary with his Sunday clothes on. He heard him ask Mr. George for use of the company's car, and corroborated George's testimony as to what Keeley said he wanted the car for. This witness said his duties were to go over the mill every hour and "punch the clock," and that he attended to this duty on February 27th.

James Vercher, an employee at defendant's mill, stated that he worked there on any Sunday when needed; that when there was work to be done on a Sunday Mr. Keeley would inform him of that fact on Saturday night. He did not work the day Keeley lost his life.

At the time of death of Keeley, Mr. J. Kelly Morse was assistant manager and mill foreman. He left Derry at 9 o'clock the morning before the tragedy, but returned that night. He testified that the mill had not been running for two days, and that repair work was generally done, when needed, on the days when the mill was closed down. It was the business of Mr. Morse to see that the mill was in condition to run the following Monday morning; that no repair work was done without his order, and none was needed on the mill on February 27th. He stated that he saw Eddie Carter leave Derry on a crawfishing trip at 7:30 o'clock that morning.

It is shown that work on defendant's sawmill on Sundays was no uncommon

thing. It is also shown that poke greens grow promiscuously about Derry, and may be found within short distance of the home of deceased. No one saw any of these greens in or about the car in which Keely was killed.

There was very little objection made to the introduction of evidence at trial of the case, and it therefore took a wide range. The witness Rachal stated that Keeley told him Saturday night he was going to Montrose the next day for repairs for the mill, and Carter testified that deceased told him on Sunday that he would go for these repairs that evening. Beyond this testimony there is nothing in the record tending to disclose the purpose of the trip to Montrose, if such purpose existed, save the evidence of plaintiff. Only a short time before she filed this suit she declared in writing she did not know why Mr. Keeley started on the trip. It seems to us unreasonable, if Keeley intended to go to Montrose for machinery or repairs for the sawmill, that he should stop about midway of the trip and turn back simply because he could not make the round trip by 1 o'clock. There was really no work going on at the mill that required his presence there at that hour or at any other hour that evening. And it is passing strange that Keeley, if he intended going to Montrose on company business, did not declare that purpose to Mr. George when he asked for the use of the company's car for twenty or thirty minutes. The car was generally used by the employees of the company.

We think plaintiff has failed to establish that her husband lost his life while discharging duties incident to or arising out of his employment with defendant, and the judgment of the lower court is therefore affirmed.